All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and Ms. Audubon Coyle. Please be seated. The first case this morning is Level 3 Communications v. Limelight. Mr. McCabe, were you with the podium? I am. You may proceed. Thank you, Your Honor. May it please the court, counsel, I want to start off with three basic points in our appeal relating to Claim 12, Claim 26, and the 935 patent. Limelight does not contest in its brief that it offered the file history and other evidence, extrinsic evidence, which had nothing to do with its own accused system, which purportedly proved non-infringement. The law has been settled for decades now that the infringement analysis consists of, one, properly construing the claims, and two, comparing the properly construed claims to the accused system. Limelight's non-infringement expert, Dr. Chase, spent much, if not most, of his testimony before the jury testifying about neither the court's claim construction nor Limelight's accused system. His disclaimer-based opinion was an exercise in claim construction, and the trial court's decision to allow the jury to hear it was reversible error as a matter of law. Well, it would be harmless, wouldn't it, if we agreed with the claim construction? Well, the claim construction is not properly before the court. I don't believe that Limelight has appealed. No, no, but we can consider that question in connection with the harmless error analysis. We're supposed to engage in a harmless error analysis. Even if we were to find that the expert shouldn't have testified, if his testimony was correct, what's the harm to it? I agree, Judge. But the problem with the opinion here on disclaimer is that there is no intentional relinquishment of claim scope anywhere in the statements made by the inventors. So that's, one, the jury shouldn't be deciding this question of disclaimer, and two, there is no disclaimer. Going back to your point, am I incorrect that your own expert, Dr. Bradner, also read the file history in connection with his opinion? And if I'm correct about that, how come your side gets to do it and the other side doesn't? Well, Dr. Bradner, as most non-infringement experts, testified in connection with his qualifications and background testimony what he had done to prepare himself to give opinions. He testified that he had read the file history. He did not testify, and he couldn't testify, about claim construction because the court had already construed the claims. That was just background testimony. I made an objection and a motion to strike at the trial that the court had already, obviously, we objected to it. You've read the motion and eliminated it. But the court had already determined this question. And so I moved to strike Dr. Chase's testimony that Level 3 had apparently in the file history, allegedly, disclaimed use of DNS as a repeater-selector mechanism. That wasn't our position, by the way. But in any event, I said that the court had already decided the question. And indeed, the court agrees with me. At page 8 of its decision on our JMAL, the court says, the court implicitly determined in its Markman order that this 807 patents repeater-selector mechanism was not necessarily limited to the preferred reflector embodiment described in the specification. So what Chase did is he gave an opinion which contradicted that statement by the court, the statement by the court of its own claim construction. Chase, in effect, and I have... Did you object to this contested testimony? Oh, yeah. We filed a motion to eliminate. There's no dispute about the I objected. We filed a written motion to eliminate. And after he gave his opinion, I moved to strike it. At page 6... Why wasn't there, in fact, from the prosecution history, a disclaimer? If I understand correctly, in the history of the parent patent, this issue of whether it covered a DNS-based system came up. And the examiner said, no, you can't claim it. And so the claims were amended to, what is it, add the phrase repeater-selector mechanism? Correct. And now you're saying that the two continuation patents, and they are continuations, the 935 and the 807, don't include that requirement. Right. You're wrong, Judge Dyke, respectfully, because in the traversal, the applicants traversed each and every rejection of the claim element which included DNS. And they said in the last one, they pointed out that the district, that this court had decided Akamai and had concluded that DNS is inherent in every Internet application. So it's just, we've cited case law which says that amending a claim without more, without stating that I'm giving up on this claim scope, so this is why I'm amending the claim. Just amending the claim by itself does not constitute disclaimer. There is no statement in this record that the applicants intended to give up a DNS-based repeater-selector mechanism or server selection. Well, I thought they said that our invention isn't DNS-based. Didn't they say that? Here's what, that's true. There is a statement in the file history in their own document when they were trying to establish the date on which they conceived. The statement is DNS is an incomplete solution. But the other statement that's in the same filing on the same page is that DNS can be. We're not ruling it out, but it's got to include something more. I'm paraphrasing, but that's a statement that we cite in our brief. And Limelight did do something more. And in the opening statement, I made it very clear that we were not alleging that Limelight's system infringed just because it was DNS-based, but because it did have something more. And that's what DNS plus any CAS, as well as this health deed, I never made the statement that just a DNS-based system would infringe. You agree it wouldn't? I haven't. The answer is I suppose it depends. Depends on what? Well, it depends on what the claim is. Well, the short answer is it could. Because we never gave up the claims goal. Depending on what? It could depend on what? Depending on whether the claim was specifically limited to DNS-based server selection. And this claim, as the judge recognizes at page 8 of his JML, he rejected the 112.6 argument, which the defendant made, that, look, you've only disclosed one embodiment and we think that 112.6 applies and you're going to be limited to that specific embodiment, which included the reflector and the fact that things were intercepted. The trial judge reviewed that argument and said, no, I find that 112.6 doesn't apply and I'm not going to limit it to what is disclosed. I'm not going to limit it to the structure, which is disclosed in the patent. Well, there may be, but what we're talking about is the consequence of the prosecution history of the 598. You have a statement in there, the DNS mechanism described above is a kind of reflection, but it is quite different from the form of reflection proposed here. Sounds like you're saying this is not DNS. Well, look, everything has to be DNS-based because that's the way the Internet works. I understand that. But the selection doesn't have to be DNS-based. And the selection, you're right, the selection doesn't have to be DNS-based and Limelight's system wasn't just DNS-based, but they made the argument that we gave up any kind of a DNS-based system, which was not true. There's no statement to the effect, respectfully, by the inventors at all that we gave up DNS-based, nor could there be. And so what I argued, pardon me, what Level 3 argued in the opening statement is the same position that we took in connection with Bradner, the expert, and in connection with the opening statement, or closing argument, and that is that DNS, that the Q system, DNS plus something else, did fall within the claims, did fall within the repeater-selector mechanism. The other problem with Chase's testimony, respectfully, is all of this testimony, 40 pages of his testimony, had nothing to do with what the court had described as a repeater-selector mechanism. Zero. Nothing. So, respectfully, we believe that the introduction of that testimony basically caused, in the guise of a written description argument, which I think Your Honor has stated, Your Honor Judge Dyke has stated that there, or Your Honor Judge Rader has stated in the Moba case, could lead to all kinds of unintended consequences. We believe, and respectfully suggest, that this is one of those unintended consequences. Specifically, that the introduction of the written description defense was used not to support the written description defense, but rather to support a non-infringement defense. I think I'm going to save 245 for my time. Thank you. Mr. Kropka? May it please the Court, good afternoon, Counsel. Let me briefly address where Mr. McKay left off. The reason that I cross-examined Mr. Swart and that Dr. Chase dealt with the file history had nothing to do with this claim. It had everything to do with the fact that Mr. Swart, the first witness that was called by Level 3, testified directly that DNS was a repeater-selector mechanism, that it wasn't given up, that they didn't intend not to cover it, and that, in fact, affirmatively, a repeater-selector mechanism could be DNS. I objected because I didn't think it was appropriate for the inventor to be able to testify about the patentment. The judge let it in, subject to our ability to cross-examine, to challenge his statements at the trial in comparison to what he and the other inventors had said during the file history to the Patent and Trademark Office. In addition, and this did introduce the written description issue into their infringement case, as the Level 3 briefs acknowledge, his testimony dealt primarily with written description. It also dealt with non-infringement. What about the disclaimer? Was there a disclaimer of DNS-based system in the prosecution history? Is the Limelight system DNS-based? Limelight system is DNS-based. It does it on a round-robin basis? Is that how it selects the repeater servers? In part. It selects it on the basis of a round-robin system, as well as the Internet Routing Protocol, known as Anycast, which routes name resolution requests through the Internet to what is essentially the closest DNS server that Limelight maintains. So it's the combination of those two things that ends up where the repeater selector that is sent back with the equivalent, server in our system. What happens is when, as Your Honor knows, the first request that's made has nothing to do with the content, has nothing to do with the user. It has everything to do only with the domain name. The domain name goes into the domain name system and gets put on the Internet routing system, and because Limelight chooses to have the same IP address for all of its domain name servers, the Internet automatically routes them to the closest one, in Internet terms, that isn't blocked by traffic problems. As a consequence, when the DNS server at Limelight sends back a list of IP addresses for content servers, the user's browser will select one of those IP addresses and send the request for content to Limelight, and it goes to one of the servers that's identified, usually in the same location. So as a consequence, it is DNS-based, and our argument about non-infringement was almost exclusively DNS, because the DNS system never sees the request for content, which is what the definition of repeater selector required. It doesn't identify a server for a particular request, which is what the definition of repeater selector mechanism required, and it doesn't actually select the server. The user's browser does by picking one of the IP addresses in the list of IP addresses that it receives. In answer to your other question, Judge Dike, I do believe there was a disclaimer, but we didn't argue it to the district court as such, and we didn't argue it to the jury, because our position was... Well, it seems to me as though you did, in fact, argue it to the jury through the testimony of your expert. We didn't intend to. We never said disclaimer. We talked about how the person of ordinary skill in the archaeo-examiner, looking at the disclosure, saw that what was disclosed as the invention, the invention, was radically different than DNS. The inventor said it was radically different or an incomplete solution from DNS. That was to rebut Mr. Swartz's testimony, and it was to support Dr. Chase's testimony, because he was testifying on behalf of the interpretation of the disclosure to someone of ordinary skill in the arch. He said, I have a real-time example of that in the examiner. He looked at this and said, there is no disclosure of it. So the purposes that we did it was... I wasn't planning on covering any of this with Mr. Swartz and their infringement case, but they went directly to written description and equating repeater-selector mechanism with DNS, so I was allowed to cross-examine. And it was two purposes, to rebut Mr. Swartz's testimony, which was critical to their case. It was their first witness. And two, to support Dr. Chase's opinion as to what a person of ordinary skill in the arch, how that person would interpret the disclosure of the 807 and 935, or actually it was only the 807 at that time. Now, one other point with respect to Mr. McCabe's quote from the Jamal opinion of the district court. Right after he said what Mr. McCabe quoted, Judge Davis said that his construction did not mean that a repeater-selector mechanism automatically encompassed every remotely similar content delivery system. Now, there may very well be a legitimate basis for arguing that the inventors here disciplined DNS, and the history of it is discordant. Is there or isn't there? Are you arguing that there's a disclaimer? I'm not arguing it here. I did not argue it after the claim construction. Well, it seems to me it's pertinent to the harmless error question. So what's your position? Was there a disclaimer or not? Yes, Your Honor, there was. They specifically distinguished DNS. They tried to read it in because of the Akamai suit and their effort to create an interference. It didn't work. They never got a claim that covered anything remotely similar to DNS. And what they argued was the 598 said reflector. They substituted repeater-selector mechanism for what they hoped was going to be DNS-based in the 807 and justified it, supported it in the record by reference to the reflector. And then they get to the 935, and they use language of enablement. And I would like to take some moments to talk about the 935, that the repeater-selector, excuse me, the repeater-server network had to be capable of handling requests. So it's the claim language that was at issue, request for resource may be handled by the repeater-server network. Every claim in the 935 covers a system or a computer network that includes a repeater-server network, which is basically repeater servers. The only disclosure in the patent of how a repeater-server network is enabled to handle a request for content is if the reflector has rewritten that resource and identified a repeater server as the target for the request for the resource in that case. So there is notice that the only system or network that's described in the patent requires a reflector so that the request can even get to the repeater-server network. And I think what's important in looking at the claims, not only of the 807, but the 935, is that, for example, in the 935, every claim talks about it in terms of may be handled. It's not talking about the action of the repeater server handling the request. It's talking about the computer network or the system that includes a repeater-server network being able to handle the request. It says a request for resource may be handled by the repeater server. So it's talking about enabling the repeater server to do it. And if you look at column 10 of the 935 patent, especially both patents, but column 10 of the 935 patent, starting at line 24, under the heading, How a Repeater Handles a Request. And what it says is, the first paragraph of that, which is lines 24 to 31, says, first of all, you have to redirect the request to the repeater-server network. How do you do that? There has to be interception. There has to be interception or otherwise direction to the reflector. There's been a lot of discussion in the briefs about how many embodiments there are. One, three, four. That's not the issue. It really doesn't matter how many embodiments there are. I thought your contention was there was only one embodiment. It is our contention. But with respect to each, and I agree with that, Judge, I believe there is only one embodiment. But the discussion doesn't turn on whether there's one, three, or four. The discussion turns on the fact that each and every one of the alleged embodiments that Level 3 puts before this Court requires that the resource be rewritten. The resource comes in and it has to be rewritten. Column 3 of the patents say the only thing that resource rewriting must be performed by reflectors. Is there anything supporting the 95-word claim interpretation of the single word handled, other than preserving validity of the patent? Yes, Your Honor. What? And that is this Court's decisions which say that claims must be limited to the invention that's actually disclosed. And you can't, for example, in the net word case that we cite, and there's another case that I'll cite to the Court, and that's Alloc v. ITC 342. That's a little different from the question I asked. I asked, where does the word handled get 95 words of commentary? That's kind of an automatic definition of importing surplusage. Well, I don't suggest that it takes 95 words. Our suggested construction included 37. And I think you need to look at it. That's still, I mean. I understand that. Why isn't it just processed? Because the word handled isn't standing alone. It's in the phrase, a request for a certain resource may be handled by the repeater server network. Would it be sufficient for you to just say that handle requires a reflector, that handling requires a reflector? That's the essence of it. Because handled, in order for the repeater server network to proceed. So what more did the district court do? Why did he take 95 words to do what we could say in three? Because the district, I think the first seven words of the district court's opinion or interpretation is probably sufficient. It's intercepted or otherwise directed to the reflector. And I think the reason the district court did this is because it went through the entire process that the reflector has to follow in order to determine. And, for example, there's things in there that probably aren't necessary. They're not wrong. They're not necessary. For example, with respect to the repeater server network, it doesn't matter if the reflector passes the request onto the origin server. It's only when the reflector chooses to reflect the request to the repeater server network that matters. So should we send it back and let you folks decide whether it's valid or not in a proper validity proceeding? Well, certainly if this court either overturns the claim construction or revises it, it may be necessary to go back for that purpose. I submit, Your Honor, it isn't necessary because, one, the district court didn't reinterpret this in order to preserve validity. It interpreted it in what it said it interpreted. It didn't say validity at all. Well, it said otherwise it will be too broad. That's pretty equivalent to saying it's preserving validity, isn't it? Well, I think in the context what he was talking about is reflected in the Jamal decision as well. He was concerned that the claim would cover more than the disclosure. Remember, he was very focused on written description because that was one of our arguments. So consistent with this court's precedent, it says you're not importing limitations from the specification if you're limiting the claims to what the specification discloses. And this specification discloses one fundamental point. The reflector is necessary in order to get something to the repeater server network, which is essentially the CDN. But the thing that's odd about that is that reflector is not cited in any of the claims, correct? Exactly, because they took the reflector out of the 807 and the 935 in an effort to broaden the scope of those claims beyond what they disclosed as the reflector. We saw it in the prosecution history leading up to the 807, and they substituted repeater server mechanisms. Well, doesn't it all boil down to the disclaimer for both of these patents that, you know, you've got what you say is a DNS-based system in limelight, and the question is did they give that up? And I suppose your position is that they gave it up both for the 935 and the 807, right? Of course, of course. But isn't the claim construction issue for the 935, doesn't that boil down to the question of whether you have given up a DNS-based system? If there is a disclaimer, then that solves the 935 as well. But what they did with the, for example, Claim 26 of the 807 patent, obtaining, again, it's a matter of where does it come from? How did they get it? And the only place that's disclosed in the patent about how you get that is from the reflector. The reflector has to be right. But the difficulty is how that globs on to the word handle in the other claims. In fairness, I think, and I recognize the district court said handle, but he said handled in the context of— But that's the term he was construing. Correct. But it was in the context of may be handled. So we're not talking about the repeater selector actually taking action. This is an apparatus claim, not a method claim. The apparatus claim, what it's saying is that the apparatus involved has a capability. The capability is that it may be capable of handling a request for content. Given the fact that it's an apparatus claim and not a method claim, it's not handled as an active verb, this is what the repeater selector mechanism is doing. It may be handled, so it's a capability. And the only thing that gives the apparatus, the system or the computer network, the capability of handling the request is the reflector by rewriting the request. And because it's rewritten, it then can go to the repeater server network. I see my time is up. Thank you, Mr. Kropotkin. Thank you. Mr. McCain. Thank you, Your Honor. Let me start with the 935 since that was discussed. At page 34 of the Markman ruling, the Court said, But how do you deal with the fact that without some claim interpretation, your whole invention doesn't even mention reflector, which is, of course, part of a parent patent, but it doesn't appear in this patent? How do you save this patent otherwise? This patent contains another element. In each and every one of the claims, there is an element that the claim, that the resource can be rejected. If you don't have the reflector, do you have an invention? Yes. What is it? Because it's got all the elements of the claimed invention and plus another element, a rejection, which is disclosed. In other words, we're not claiming. If you don't reflect it to a repeater, what do you do? The claim, you can write the claim, and this claim was written to provide a client for a client request. A client request was construed very broadly by the Court. It was construed as, and this, I believe, is at page 26 of the Markman ruling, a message from a client requesting a resource, which is located in a computer network such as the Internet. That construction specifically permits that a client request for a resource can include a request which bypasses the reflector. That's the way, and that is a proper construction. Well, can you point to any of the figures, which I think all cite a reflector, and the specification is full of reference to a reflector, not just in the preferred embodiment, but in the summary, etc. Can you point us to, then, where we should get that from the specification? I believe it's in Figure 2. Again, the Court rejected Limelight's position, which is still advancing. You see in the lower left-hand corner, it says, or a reflector or a repeater, in terms of what receives the URL request. But this Figure 2 is explicitly just intended to show how a repeater handles a request. That's true, but that's what the claim deals with, how a repeater handles a request. Do you have a final thought for us, Mr. McKeague? I have one final thought. First of all, if you read the definitions of a client request for a resource, in conjunction with the other term, a repeater server network, which is handled, and handled appears between both of those terms, it's clear that the meaning is either processed or managed. If I may, on Claim 26, a very simple, very easy point. Obtaining was used by Level 3. Your single thought is starting to multiply, Mr. McKeague. I got one. Thank you. If you read Claim 26, it says, obtain a client request for information. The client request being for a resource which is embedded in another document. That request never goes through the repeater selector mechanism, ever, because it already knows where to go. So that, I respectfully suggest, is another reason why grafting a repeater selector mechanism into Claim 26 was an error. Thank you very much. Thank you, Mr. McKeague.